## Bellows ad. vs. Cheek.

If, upon the presentation of a claim, duly authenticated, against the estate of a deceased person for allowance, the administrator neither allows or rejects it, but endorses thereon a reference of the matter to the decision of the Probate Court, the demand must be regarded as rejected; and the creditor may apply to the Probate Court for allowance.

Where no notice has been given to the administrator, as prescribed by the statute, of the application to the Probate Court for allowance of a claim against his intestate's estate, which has been rejected by him, if he appear and defend upon the merits, the notice will be considered as waived.

Formal pleadings are not required in the Probate Court, but if a party elects to file a written plea, he must conform to the rules of special pleading: and so, such written plea must be signed by the party, or some licensed attorney, or it may be stricken out on motion.

Where a motion to strike out a plea, filed in the Probate Court, upon the ground that it was not signed by the defendant, or by an attorney of any court of this State, is sustained; and it appears that the plea was signed by a person other than the party, but whether or not he was an attorney does not appear, this Court will presume in favor of the correctness of the judgment, that he was not.

Where the purchaser of real estate has paid any part of the purchase money, and the vendor does not complete his engagement, so that the contract is totally unexecuted, the purchaser may affirm the agreement by bringing an action for the nonperformance of it, or he may elect to disaffirm the agreement *ab initio*, and may bring an action for money had and received to his use.

Although the contract is under seal, and the purchaser might maintain an action of covenant for the breach of it, yet he may also, if he have a right to rescind the contract, bring an action for money had and received, to recover back his purchase money.

If the circumstances be such that, by rescinding the contract, the rights of neither party are injured, in that case, if one contracting party will not fulfill his part of the agreement, the other may rescind the contract and maintain his action for money had and received, to recover back what he may have paid upon the faith of it. But a contract cannot be rescinded without mutual consent, when circumstances have been so altered, by part execution, that the parties cannot be put in *statu quo*.

Where one party is desirous of rescinding a contract by reason of the other's default, he must do so *in toto*. He must put the other *in statu quo*, by an entire surrender

of possession, and of everything he has obtained under the contract, or he cannot recover the consideration in an action for money had and received.

If one contracting party has a right to rescind a contract partly executed, where the circumstances arising out of it are complicated, it must be done in a court of chancery; and not in the Probate Court, upon a proceeding by one of the parties for an allowance against the estate of a deceased contracting party for the purchase money.

*Appeal from the Circuit Court of Crittenden county.*

Hon. GEORGE W. BEAZLEY, Circuit Judge.

WATKINS & GALLAGHER, for the appellant.

The whole proceeding is erroneous, *ab initio:* the record showing on its face that it is a case of which the Probate Court could not take jurisdiction,

The claim is founded on a contract in writing, partly performed, alleged to be broken, and sought to be held as partially rescinded; and therefore, clearly not within the jurisdiction of the Probate Court. That court is essentially a court of *law*, and as such, has cognizance only of the *legal* rights of the parties before it. The record, in this view, discloses a case peculiarly within the exclusive jurisdiction of equity. It is only in a chancery tribunal that a full adjustment can be made and adequate relief afforded.

The statute recognizes only one mode in which a claim, valid in all other respects, can come under the jurisdiction of the Probate Court, viz:

On *refusal* of the administrator to allow, *and notice* to him of the intended presentation of the claim for adjudication by the court. The mere fact of the existence of a valid claim does not give the court jurisdiction, except the other two requisites are added—*i. e.*: *refusal* and *notice*. *All* these requisites must unite; and the absence of either one is fatal to the jurisdiction. See *Dig. ch.* 4, *secs.* 100, 101, 102.

In the case at bar, these requisites were all wanting. There

27

was, as we contend, no valid claim; and, as the record shows, neither *refusal* nor *notice*.

The Probate Court being the creatnre of the statute, must, both in regard to the extent it exercises, as well as to the mode in which it acquires jurisdiction, keep strictly within the terms of the law. Every departure is a fatal misstep—every unauthorized act an ineffectual effort.

The notice required by the statute to be given to the administrator, of the presentation of the claim to the Probate Court, was not given, and, consequently, the Court could not take jurisdiction either of the person of the administrator or the claim.

This point was expressly decided in the case of *Pennington's adm'r vs. Gibson, use, etc.*, 1 *Eng.* 447.

The apppellee's claim is based on a supposed rescision of a written contract of sale and exchange of lands and personal property, between appellee and appellant's intestate, under which appellee had entered into possession, held possession for two years—had the benefit of the hire of the slaves, and received and retained a large amount of personal property. It was error to allow the claim, because,

There was no rescision, inasmuch as Cheek did not establish either of the following positions:

1. Mutual consent—or permission to rescind.

2. Failure to comply, springing from fraud of Lumpkin.

3. A disability preventing performance by Lumpkin.

4. That both parties could be put in *statu quo*.

5. That Cheek had not derived an advantage by partial performance.

6. That the rescision claimed was a rescision *in toto*.

These are the leading principles of the doctrine of rescision. In the case at bar no showing was made;

1. That Lumpkin ever consented to, or permitted a rescision.

2. No failure to comply, springing from fraud in Lumpkin, is alleged or attempted to be shown.

3. No disability is shown preventing performance by Lumpkin.

4. Both parties could not be put in *statu quo*. It could *not* be done in the *Probate Court*. There was no attempt to have it done in this proceeding. On the contrary, it was attempted to rescind as to part and to sustain as to the houses and lots. Even if Lumpkin had made default and Cheek had not received any benefit, or had possession of the land, still Cheek did not *in fact* rescind. To put himself even *in position to rescind*, it was incumbent on him to tender to Lumpkin a relinquishment in writing of the plantation, and tender deeds for Lumpkin to execute, reconveying the Memphis lots, etc., to Cheek, offer to give him the negro hire, and the stock and property conveyed in the contract, and the rents and profits of the land. *Ch. on Cont.* 498, 574; 2 *Parsons on Cont.* 191, *note o.*; 1 *Met. R.* 547; 23 *Pick. R.* 283; 4 *Mass. R.* 502; 15 *Ib.* 319.

" A contract cannot be rescinded without mutual consent, when circumstances have become so altered, by part execution, that the parties cannot be put in *statu quo*, for if it be rescinded at all, it must be rescinded *in toto*." 2 *Ala. R.* 189.

Rescission is not allowed where there has been a partial performance—nor where the parties cannot be put in *statu quo*. *Desha's Exrs. vs. Robinson admr.*, 17 *Arks.* 228; and cases there cited.

Upon a bill in equity by the purchaser of real estate for the rescission of the contract of sale, and re-payment of the purchase money, the complainant must show a surrender of the property, or an offer to surrender it to the person entitled, and that the vendor can be placed in *statu quo*. The allegation that he had abandoned and yielded the possession of the land is insufficient. *Davis vs. Tarwater*, 15 *Ark.* 286.

5. It was error to allow this claim, as was done by the Probate Court, on the basis of a rescission by appellee; because he was not entitled to rescind, inasmuch as he had derived an advantage by partial performance.

The rule is: " If one of the parties has derived an advantage

from a partial performance, he cannot hold this, and consider the contract as rescinded, because of the non-performance of the residue; but must do all that the contract obliges him to do, and seek his remedy in damages." *Parsons on Con.* 193.

Here Cheek had derived the advantage of a partial performance. He had possession of the lands, from which there was no eviction—he had the use of the slaves for making his first crop; had used the provisions, had used and kept the stock, tools; and used, and carried off, and sold the property, etc.

6. The rescission was not claimed to be a rescission *in toto;* and therefore it was erroneous for the court to consider the contract as rescinded and make the allowance of the claim as liquidated damages.

The damages cannot be liquidated until the rescission of a contract; and further, on the rescission of a contract for the exchange of property, each party is entitled to receive his property back, as far as may be, *in specie.* Cheek's remedy, on the rescission, would be for the lots and damages, not solely for damages, because that would be rescinding a part, and affirming as to part. See cases cited and 1 *Metc. R.* 547; 23 *Pick.* 283; 4 *Mass. R.* 502; 15 *Ib.* 319.

FOWLER & STILLWELL and CUMMINS & GARLAND, for the appellee.

On agreements for the sale of land where the purchaser has paid any part of the purchase money, and the seller does not, or cannot complete his engagement, the purchaser may elect to disaffirm the agreement *ab initio,* and recover back the money paid, as so much had and received to his use, etc., with interest. See 1 *Sug. on Vend.* 367, 368, 369; 1 *Esp. Nisi Prius* 2; *Camp vs. Palaer,* 5 *Barb. S. C. Rep.* 92; *Battle vs. Rochester, ib.* 421; 1 *Caines Rep.* 47; 5 *J. R.* 85; 9 *Cowen* 46; 4 *Eng.* 559; 2 *Parsons on Cont.* 191; 7 *Cowen* 662.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

It appears from the transcript in this case, that on the 18th July, 1855, Geo. W. Cheek presented to the Probate Court of

Crittenden county, for allowance against the estate of *John W. Lumpkin*, deceased, the following account:

" JOHN W. LUMPKIN,

To GEORGE W. CHEEK,        *Dr.*

To amount due on two houses and lots · · · · · · · · · · · $ 7,000 00

To amount paid in part payment of a tract of land

to which the said Lumpkin failed to make title,    5,000 00

$12,000 00

Appended was the affidavit of Cheek, that the sum demanded, with interest from 4th March, 1823, was justly due, etc., and upon the account was the following endorsement:

I acknowledge due and legal exhibition of the within claim, and submit the same to the Probate Court of Crittenden county, Arkansas, for its action.

Q. M. BELLOWS, *Adm'r.*

June 25th, 1855.

It seems that Bellows (who had shortly before been appointed administrator of Lumpkin by said Probate Court) did not appear to contest the allowance of the claim, and the Court treating the above endorsement as notice to him of the application for the allowance of the claim, proceeded to hear evidence on the part of Cheek, and allowed the demand.

At the same term (on the 25th July,) appeared *James Wickersham*, who had been appointed administrator of *Lumpkin* by the County Court of Shelby county, Tennessee, where he resided before and at the time of his death, and moved to set aside the judgment of the Probate Court allowing said demand; representing, on oath, that Cheek had procured the appointment of Bellows as administrator of Lumpkin, by the Probate Court of Crittenden county, without the knowledge or consent of the heirs and distributees of the estate, for the purpose of procuring the allowance of said demand, etc., etc., and that the claim was invalid, etc.

The Court sustained the motion, and set the cause for hearing anew, on the first day of the next term.

At the next term (15th October, 1855) the parties appeared, and Wickersham, on behalf of the estate, and in the name of Bellows, as administrator, filed a plea in abatement, alleging, in substance, that in November, 1853, Cheek had filed a bill against Lumpkin in the Circuit Court of the United States for the District of West Tennessee, at Jackson, upon the same cause of action, and for the recovery of the same demand, as that filed for allowance in the Probate Court in this case, and that the bill was still pending and undetermined, etc.

On motion of Cheek, the plea was stricken out, and Bellows excepted.

The claim was then submitted to the court, and upon the evidence introduced by the parties, the court allowed the demand, and rendered judgment against Bellows, as administrator of Lumpkin, for $12,000, etc.

Bellows excepted and appealed to the Circuit Court of Crittenden county; where, upon inspection of the record, the judgment of the Probate Court was affirmed, and Bellows appealed to this court.

1st. It is insisted by appellant that the Probate Court could not take jurisdiction of the claim until the administrator had allowed or rejected it, and that in this case he did neither.

It is the duty of an administrator, under the statute (*Dig. ch.* 4, *sec.* 112, 113,) either to allow or reject a demand when presented to him for allowance.

But if he chooses to disregard his duty, the creditor cannot control his conduct. All that he can do is to present his claim, in proper form, to the administrator, and demand its allowance. If he does not allow it, and so endorse it, the demand must be regarded as rejected, though he may not choose to endorse his disapproval (*as in Borden vs. Fowler, adm.* 14 *Ark.* 473,) or though he may refer the matter to the decision of the Probate Court, as in this case. The purpose of the statute was accomplished in affording him an opportunity of allowing or rejecting the claim. *Hudson, as adm'r. vs. Breeding et al.* 2 *Eng.* 446.

2d. It is next insisted that the judgment of the Probate Court

should have been reversed by the Circuit Court, because the appellant was not given ten day's notice of the application to the Probate Court, by the appellee, for the allowance of the demand, as required by the statute. (*Dig. ch.* 4, *sec.* 114.)

If the case were here on an appeal from the first allowance of the claim, there might be something in this objection, as the endorsement upon the account made by the appellant, referring the claim to the action of the Probate Court, would not, perhaps, be treated as a waiver of notice of the time when the demand was to be presented to the court for its decision. But the first allowance of the claim was set aside, a new hearing ordered on the first day of the next term, when both parties appeared, and after the plea in abatement was stricken out, they submitted the cause to the court upon the merits, the appellant making no objection, for want of notice.

The notice which the statute requires to be given to the administrator of the intended application to the Probate Court for the allowance of a claim, answers the purpose of the writ in the ordinary actions. Its object is to afford the administrator an opportunity of appearing before the court, and contesting the demand. But in this case the appellant appeared, and depended upon the merits: and thus the object of the notice was accomplished; or, in other words, notice was waived. *Pennington ad. vs. Gibson,* 1 *Eng. R.* 447.

3. The grounds assigned in the motion to strike out the plea in abatement, were, *first,* that it was not signed by the defendant, or by an attorney of any court of this state, and *second,* that it was filed after new trial granted, etc.

The plea was signed " *J. Wickersham, Att'y.*"

In the Probate Court formal pleading is not required. *Dig. ch.* 4, *sec.* 117. But it has been held that if a party elects to file written pleas, he must conform to the rules of special pleading. *Pennington ad. vs. Gibson,* 1 *Eng.* 451.

The statute regulating practice in the Circuit Courts, declares that every declaration, statement, or other pleading, shall be

signed by the party filing the same, or his attorney.  *G. Dig.* *ch.* 133, *sec.* 52.

In the KING's BENCH, a *plea in abatement* should be signed by counsel.  In the common pleas it is signed by a sergeant.  1 *Tidd's Prac.* 640.

A plea not signed by counsel, etc., may be stricken out.  *Sillivant et al. vs. Reardon*, 5 *Ark.* 140; *Carrington et al. vs. Hamilton*, 3 *ib.* 416.

In this case the plea in abatement was not signed by Bellows, the defendant in the suit.  *Wickersham* was not a party—whether he was a licensed attorney in this State, does not appear, but we must presume in favor of the correctness of the judgment of the Probate Court, and conclude that he was not.

4. On the trial before the Probate Judge, it was proven that on the 6th of March, 1851, Lumpkin and Cheek entered into a sealed contract, containing, in substance, the following stipulation.

" I, (John W. Lumpkin,) have bargained and sold to George W. Cheek, of Memphis, Tenn., my farm, in Tunica county, Miss., containing 1500 acres, etc. etc., at $10 per acre, embracing the north half of section 11, etc., [*here the several tracts are described.*]

'' In said sale, said Lumpkin sells said Cheek all of his stock of every kind, mules, cattle, hogs, etc., all his farming utensils, wagons, carts, ploughs, hoes, axes, etc., and all the corn, hay and fodder on hand, also the meat, and wood that is cut on the farm, and was on it 1st March, except what belongs to the negroes.

" Said  Cheek is to have the  wood-boat, and  cotton-gin and press; in short, the  said Cheek is to have  every thing that was on the place except the cotton.

" Said Cheek is to have the work of the hands from the first March  to  the  25th December next, except Aleck, Albert and Frank—said Lumpkin is to clothe the  negroes, and said Cheek is to board them and treat  them well.

" The said Cheek is to have full possession of every thing from this date, etc.

" The said Cheek is to give said Lumpkin the house known as the *Farmer's Inn*, corner of Poplar and Market street, and the lot down to the brick mill, and thence a straight line with the brick mill and market street (*Memphis*,) and is to make said Lumpkin a good and lawful title to the same, clear of all incumbrance, and Lumpkin is to have the right of possession from this time.

" The said Cheek has also given up to said Lumpkin the house and lot on Beale street, which Lumpkin sold to *Elijah Cheek*—the said George W. Cheek, has obtained from said *E. Cheek*, the said house and lot, and *E. Cheek* has assigned and delivered to said Lumpkin, the agreement and the deed which he made to him, and which has never been recorded.

" And the said George W. Cheek has given to said Lumpkin *E. Cheek's* negotiable note for $1,000, due in four months from the 4th March, 1851, in part pay for said tract of land; and the said George W. Cheek is to give to said Lumphin, his negotiable note for $2,000 payable in four months from the 4th March, 1851; and his negotiable note for $3,000, payable the 1st March, 1852, and his negotiable note for $,3,000 payable 1st March, 1853—which is in full for said tract of land.

" Said Lumpkin is to make the said Cheek a good and lawful title to said tract of land, and clear it of all incumbrances of any kind. Said Lumpkin is to comply with every part of the foregoing, before the last note is paid.

" Said Cheek is to give said Lumpkin a deed of trust on said tract of land, to secure the payment of the aforesaid notes. C. F. Richardson is to be the trustee, and shall have the right to sell all or such part as may be necessary to pay whatever amount is due on the aforesaid notes, by advertising the same in two newspapers, printed in Memphis, for thirty days; and then sell to the highest bidder for as much cash as is due.

" And the said George W. Cheek, and the said J. W. Lump-

kin bind themselves, their heirs and assigns, to comply with this agreement under the penalty of $3,000," etc.

It was further proven upon the trial, that on the day upon which the above agreement was made, and in pursuance thereof, Cheek conveyed to Lumpkin the house and lot in Memphis, described as the *Farmer's Inn*, etc., reciting in the deed that the same was bargained and sold to Lumpkin, in consideration of $4,000, etc., and as part of the price of a tract of land which Lumpkin had sold and conveyed to Cheek on that day, etc.

Also, that Cheek, in accordance with the agreement, executed to Richardson, a deed of trust upon the lands purchased by him of Lumpkin, to secure the deferred payments, in which he covenanted that he was lawfully seized of the lands and had good right to convey the same, etc., and bound himself, etc., to warrant and defend such title thereto as he had from Lumpkin, etc.

Also, that the note of Cheek for $3,000 due 1st March, 1853, remaining unpaid after maturity, Richardson sold the lands under the deed of trust, Lumpkins purchased them for $216, and obtained Richardson's deed therefor, dated 1st July, 1853.

That Lumpkin sold and conveyed the lands to George W. Underhill for $3,000, by deed bearing date 14th September, 1853.

RICHARDSON, introduced by Cheek, testified that he heard Cheek and Lumpkin both say that they had made a trade—that Cheek had sold Lumpkin a house and lot on Beale street, and one on Poplar street, in Memphis—thinks the Beale street property was $3,000—that he heard Lumpkin say that Cheek had paid him all on the land trade except $3,000—thinks the amount to be given by Cheek to Lumpkin for the land, was $15,000. Witness was trustee in the deed of trust from Cheek to Lumpkin, to secure the purchase money, and as such advertised the land—Cheek notified witness, and Lumpkin, through witness, once orally and once in writing, that Lumpkin had never made a deed to him for said land; and wished witness to notify Lumpkin that if the contract was not complied with, he

would abandon the contract or trade—*witness considered this substantially an abandonment.* This was before the trust sale. * * * Witness further states that he had notified Lumpkin that he had been requested by Cheek to notify him that if he did not comply with his contract, and make said Cheek a deed, that Cheek would abandon the contract, and Lumpkin told witness that he could not comply with Cheek's requisition.—- This was before the sale under the deed of trust, and after the 1st March, 1853. When the last note fell due witness sold the land under the deed of trust. The notice to Lumpkin was, if he would comply with his contract, Cheek was ready to comply with his, but if he did not comply Cheek would abandon the trade. Sometime, either before or after the sale, Lumpkin told witness that he had got the deed which perfected his title to the land.

Busby, witness for Cheek, also testified that in 1851, Lumpkin sold Cheek the land, and Cheek let Lumpkin have the two houses and lots in Memphis, in part payment, both amounting to $7,000. He heard both parties say this—they told him that the whole contract for the land was $15,000, and that Cheek had paid all but $3,000. Lumpkin bought the land at trust sale, and afterwards sold it to Underhill. Cheek notified witness to deliver up the land and every thing to Lumpkin, in April, or the spring of 1853. Witness informed Lumpkin what Cheek had ordered in the premises. Cheek moved off the land all his property, but left witness, who was the overseer, on the place, and he remained there until after the trust sale. Cheek planted but did not cultivate the corn, in 1853—he was to give one thousand dollars for the stock and the use of the negroes for the balance of the year 1851. The land was kept by him two years, and cultivated, and was worth $3 00 per acre rent, for 180 acres—the amount cultivated—witness was overseer for Lumpkin before he sold the land to Cheek, and continued on the land as overseer for Cheek, after he purchased the land, in 1851. Had heard Lumpkin say he was fearful he could not get title to part of the land embraced in the tract sold to Cheek.

Cheek was put in possession of the land, stock, etc., at the time of the sale and kept and cultivated the same two years, etc.

ELIJAH CHEEK, father of George W., testified that the $7,000 item in the account in controversy, was for the price the two houses and lots were taken at by Lumpkin, in the trade, being $3,000 for the Beale street property, and $4,000 for the Poplar street property. The item in the account for $5,000 was for cash paid by Cheek to Lumpkin. Witness had examined, and there was no deed from Lumpkin to Cheek for the land. He, as agent-for Cheek, in February, 1853, before the last note fell due, demanded title of Lumpkin; and he said he could not comply with his contract in relation to the land with Cheek. Witness then told him if he did not comply, Cheek would abandon the contract. Cheek did abandon the contract, left the place and gave it up, of all which Lumpkin had notice. The value of the rent of the Beale street property was $50 per month, or $600 a year.

Cheek abandoned the place in March, 1853, voluntarily, after having possession two years, etc.

Witness further testified, on cross-examination, that Lumpkin never made a title to Cheek for land, so far as he knew. That he said he would give him a deed, as he wanted to take a deed of trust from him to secure the purchase money, and the deed of trust would not be good unless he made to Cheek a deed. Lumpkin did prepare a deed conveying the property to Cheek, before the deed of trust was given, and handed it to witness, who read it, and was not satisfied with it, and wrote his objections on it. Lumpkin took it again, and said he would make one to suit, in compliance with contract, and send it to Tunica county, Miss., to be recorded with the deed of trust, but never did, that witness knew of. Could not recollect whether the deed Lumpkin handed to witness did or did not contain all the covenants embraced in the contract, but it did not suit witness, and he would not take it, because he did not think it a compliance with the contract of Lumpkin with Cheek, for whom witness was acting as agent in the matter. There was an endorsement on the note due 1st March, 1853,—the last note—

that there was not a perfect title, and that that was not to be paid until Lumpkin made Cheek a good title, clear of all incumbrance.

It was in February, 1853, witness made a demand upon Lumpkin to comply with his contract. Witness then supposed that he had made a deed, and sent it down to be recorded, as he had previously agreed to do, and at which time Lumpkin told witness he could not comply. Witness did not know of any failure to comply on the part of Cheek, but believed that he did comply with every part of his contract, except the payment of the last note.

The above is the substance of so much of the evidence introduced by the parties, as is material to be stated.

Upon the evidence, the appellant objected to the allowance of the account, or any portion thereof, but the Court overruled the objection, and allowed the account as above stated, and the appellant excepted, etc.

Where the purchaser has paid any part of the purchase money, and the vendor does not complete his engagement, so that the contract is totally unexecuted, he, the purchaser may affirm the agreement, by bringing an action for the non-performance of it, or he may elect to disaffirm the agreement *ab initio*, and may bring an action for money had and received to his use. *Sugden on Vend.*, p. 256; *Dart's Vend. & Pur.* 443; 2 *Parsons Cont.* 190.

Although the contract is under seal, and the purchaser might, for a breach of the contract, maintain an action of covenant, yet he may also, if he have a right to rescind the contract, bring an action for money had and received, to recover back his purchase money. The seller holds the money against conscience, and, therefore, might be compelled to refund by an action for money had and received. 1 *Sug. Vend.* 257; *Weaver vs. Bartly,* 1 *Caines R.* 47.

If the circumstances be such that, by rescinding the contract, the rights of neither party are injured, in that case, if one contracting party will not fulfil his part of the agreement, the other

may rescind the contract and maintain his action for money had and received, to recover back what he may have paid upon the faith of it. *Hunt vs. Silk*, 5 *East* 449; *Desha's Ex'r vs. Robinson*, 17 *Ark.* 237.

In order to sustain an action in this form, it is necessary that the parties should, by the plaintiff recovering verdict, be placed in the same situation in which they originally were before the contract was entered into. *Ib.*

A contract cannot be rescinded without mutual consent, when circumstances have been so altered, by part execution, that the parties cannot be put in *statu quo;* for if it be rescinded at all, it must be rescinded *in toto*. 2 *Ala.* 189; 17 *Ark.* 228.

Where one person is desirous of rescinding a contract by reason of the other's default, he must do so *in toto*, and cannot hold on to part. He must put the other *in statu quo*, by an entire surrender of possession, and of everything he has obtained under the contract, or he cannot recover the consideration in an action for money had and received. *Voohces vs. Young*, 2 *Hill (N. Y.) R.* 298; 17 *Ark.* 238; *Seaborn vs. Sutherland, Ib.* 603; *Davis vs. Tarwater*, 15 *Ark.* 291.

In the case before us, on an alleged failure, or inability of Lumpkin to make Cheek a complete title to the lands in question, Cheek, after notice of his intention to do so, abandoned the land, etc., and subsequently, after the death of Lumpkin, applied to the Probate Court for the allowance of an account against his estate for that portion of the purchase money, etc., paid to him by Cheek under the contract. This must be regarded as equivalent to an attempt on the part of Cheek to . rescind the contract, and bring an action for the purchase money.

It may be remarked, in the first place, that $7,000 of the $12,000 demanded by Cheek, were not paid to Lumpkin in money, but in two houses and lots in Memphis. He does not propose, in the mode adopted by him for the rescission of the contract, to take back these houses and lots, but to affirm so much of the contract as transferred them to Lumpkin, and to

treat the price at which he took them in the exchange of property as so much cash in his hands. Thus Cheek would rescind in part the contract, and affirm it in part.

Again, he had possession of the farm for two years, and took the rents and profits thereof, and, in the mode of rescinding adopted by him, he does not account for them.

He also had the benefit of the labor of a part of the slaves of Lumpkin from the 1st of March to the 25th of December, 1851, under the contract, for which he does not account.

Moreover, what has become of the mules, cattle, hogs, farming implements, corn, hay, fodder, meat, and cut-wood, which he obtained possession of under the contract? Did he consume them during the two years in which he had possession of the farm; and, if so, how does he propose to account for the use or value of them in his mode of rescinding the contract?

It is manifest, from the rules of law above laid down, that upon the facts of this case, Cheek could not rescind the contract, and maintain a suit for the purchase money in the mode attempted by him.

It must be manifest, also, that if he has the right to rescind, under the complicated circumstances of the case, he must do it in a Court of Chancery, where, under the peculiar powers of that Court, an account may be taken, the entire contract rescinded, and the parties placed in *statu quo*; and that the Probate Court was not competent to settle and adjust the complicated matters in dispute between the parties.

The judgment of the Circuit Court must be reversed, and the cause remanded, with instructions to the Circuit Court to reverse the judgment of the Probate Court, and grant to the appellant a hearing *de novo*, and to dispose of the cause in accordance with the law, and not inconsistent with this opinion.